12 CIV 0492

Steven M. Hecht, Esq.
**LOWENSTEIN SANDLER PC**
1251 Avenue of the Americas
New York, New York 10020
Tel. (973) 597-2380
Fax (973) 597-2381
shecht@lowenstein.com
*Attorneys for Plaintiff*

DOC # 1

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

U.S. DISTRICT COURT FILED JAN 2 0 2012 S.D. OF N.Y.

| | |
|---|---|
| **STERLING INFOSYSTEMS, INC.,**<br><br>Plaintiff,<br><br>v.<br><br>**BRUCE MYERS, TALENTWISE, INC., JOHN AND JANE DOES 1-10, ABC CORP. 1-10,**<br><br>Defendants. | Civil Action No.<br><br>**VERIFIED COMPLAINT** |

Plaintiff Sterling InfoSystems, Inc. ("Sterling" or the "Company"), by way of its Complaint against Defendants Bruce Myers, TalentWise, Inc., John and Jane Does 1-10, and ABC Corps. 1-10 (collectively, "Defendants"), hereby alleges and says as follows:

**NATURE OF THE ACTION**

1. This is an action by Sterling to enforce the restrictive covenants that Defendant Bruce Myers, its former regional vice president of sales, agreed to when he commenced employment with Sterling in or about November 2007.

**PARTIES, JURISDICTION AND VENUE**

2. Sterling is a Delaware corporation with its headquarters located at 249 West 17th Street, 6th floor, New York, New York 10011.

3. Bruce Myers is an individual residing at 3703 Sterling Avenue, Bloomington, Indiana 47401. Mr. Myers was employed as a regional vice president of sales for Sterling from

November 2007 until he resigned from his employment effective January 6, 2012. Upon information and belief, Mr. Myers either has commenced or is about to commence employment with TalentWise, Inc., a competitor of Sterling.

4. Upon information and belief, TalentWise, Inc. is a Nevada corporation with its headquarters located at 500 108 Avenue, 25th Floor, Bellevue, Washington 98007.

5. John and Jane Does 1-10 and ABC Corps. 1-10 are unknown individuals and/or corporate entities that may have engaged in wrongdoing as against Sterling with respect to this matter whose identities are yet to be determined.

6. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds $125,000, exclusive of costs and interest, and because there exists complete diversity between the parties.

7. Venue is proper in this judicial district pursuant to 28 U.S.C. 1391(a) because (a) the contract at issue provides it is subject to the courts and law of this district; (b) Defendants have taken actions purposefully directed towards New York and have purposefully availed themselves of the privilege of conducting activities in New York such that they have minimum contacts to support venue in this judicial district.

## GENERAL ALLEGATIONS

8. Sterling is in the business of conducting employment screening, including criminal background checks, previous employment verification, educational credential verification, and drug testing. Sterling's headquarters are in New York and has satellite offices around the country.

9. The Company has approximately 1,700 employees worldwide, several hundred of whom are located in the United States. Of those employees, approximately 65 are in sales.

10. Sterling's industry is highly competitive. In particular, while the products and services delivered by other companies in this space bear similarities to Sterling's, the distinctive elements that set its business apart from the others consist of the identity of Sterling's customers

-- including the manner in which Sterling establishes and deepens its customer relationships – as well as its prices and its profit margins.

11. Given the nature of Sterling's business, the Company prizes above all the development and protection of its customer relationships, which it views as its most valuable asset. Any development that would taint or jeopardize the Sterling brand and how Sterling is perceived or valued by its customers is the single greatest risk to Sterling's business. Accordingly, the very legitimacy of Sterling's business relies primarily on the reputation of the Sterling brand and the employees and officers that represent it.

12. The Company does not advertise the identity of its customers and chooses to remain discreet about pricing instead of advertising such items on its website or elsewhere.

13. Defendant Bruce Myers, who worked as a Regional Vice President from November 2007 until his recent resignation and separation from employment on January 6, 2012, was privy to all of the Company's highly sensitive and confidential information about its customers, including their identities, product selection and account management.

14. In this position, Mr. Myers had access to the Company's customer lists, prospect lists and pipelines, sales strategy, pricing and margin information, and other financial data.

15. Mr. Myers also had access to daily revenue reports identifying which customers were buying which products, information which was closely guarded and for which access was severely limited.

16. In addition, the Company continues to modify its business plans and strategies, and Mr. Myers was entrusted with this information, including strategies regarding possible mergers and acquisitions.

17. As Regional Vice President, Mr. Myers was responsible for, among other things: overseeing sales management and sales operations to ensure the highest levels of customer service and satisfaction; developing sales strategies and driving revenue growth for the Company; negotiating and assisting with sales efforts with large prospects and customers; contributing strategically to the growth and direction of Sterling's products and services; and

establishing and maintain significant relationships with Sterling's clients' senior-level decision-makers.

18. Mr. Meyers supervised approximately 8-10 employees and was responsible for hiring, training and mentoring both sales management and sales representatives.

19. Given his close relationships with both Sterling's employees (including upper-level management) and customers, as well as the key role he played in helping develop the Company's strategic vision, Mr. Myers had virtually unlimited access to the Company's confidential information.

20. Because of the sensitivity of the confidential and proprietary information to which Mr. Myers had access, he was required to sign certain agreements with Sterling from the outset of his employment in November 2007.

21. Mr. Myers signed a Sales Commission Agreement (the "Agreement"), which contains explicit terms regarding the confidentiality of Sterling's business information and trade secrets, as well as noncompetition and non-solicitation clauses.

22. The confidentiality, noncompetition and non-solicitation provisions contained in the Agreement were critical to Sterling's employment of Mr. Myers, and Sterling would not have employed Mr. Myers if he had not agreed to the covenants in the Agreement.

23. In the Agreement, Mr. Myers voluntarily and expressly agreed in Section 5(d), among other things, that during his employment and for one year thereafter that he would not "directly or indirectly engage in, assist, or have any active interest or involvement whether as an employee, agent, consultant, creditor, advisor, officer, director, stockholder... in any person, firm, or business entity which, directly or indirectly, is engaged in the same information services business as that conducted and carried on by the Company during [his] employment with the Company." Agreement, § 5(d).

24. With respect to the solicitation of customers, Mr. Myers agreed that during his employment and for one year thereafter that he would not, "directly or indirectly, solicit, contact, do business with, call upon or communicate with any customer, former customer or prospective

customer of the Company for the purpose of providing or selling services or other business engaged in by the Company at the time of [his] separation from employment." Agreement, §5 (e).

25. Pursuant to the terms of Section 5(e) of the Agreement, this restriction applied to "any customer, former customer or prospective customer of the Company with whom [Mr. Myers] had contact or about whom [Mr. Myers] obtained Confidential Information or Trade Secrets [as defined in the Agreement] during the twenty-four (24) months preceding [Mr. Myers'] separation from employment with the Company." Agreement, § 5(e).

26. In Section 5(f) of the Agreement, Mr. Myers also agreed to a restriction on soliciting the Company's employees whereby he would not, both during his employment and for one year thereafter, "either on [his] own account or on behalf of any person, company, corporation, or other entity, recruit, solicit, interfere with, or endeavor to cause any employee of the Company with whom [Mr. Myers] came into contact or about whom [Mr. Myers] obtained confidential information, to leave employment with the Company." Agreement, § 5(f).

27. Mr. Myers also acknowledged when he signed the Agreement that during his employment he would be entrusted with access to "Confidential Information", as that term is defined in the Agreement, that he would protect the Confidential Information, would return all Confidential Information in his possession upon the separation of his employment, and would not disclose or use any of that information following his separation. Agreement, §§ 5(a)(i), (b), (c).

28. Mr. Myers also acknowledged in Section 5(a)(ii) of the Agreement that: "[A]ny disclosure, divulging, revelation or use of any Confidential Information and Trade Secrets, other than in connection with the Company's business or as specifically authorized by the Company, will be highly detrimental to the Company, and that serious loss of business and pecuniary damage may result therefrom." Agreement, § 5(a)(ii).

29. Mr. Myers further agreed in Section 5(b) of the Agreement that: "[E]xcept as specifically required in the performance of [his] duties on behalf of the Company, [he] will not,

while associated with the Company and for so long thereafter as the pertinent information or documentation remains confidential, directly or indirectly use, disclose or disseminate to any other person, organization or entity or otherwise use any of the Company's Confidential Information or Trade Secrets." Agreement, § 5(b).

30. Similarly, Mr. Myers agreed to the terms of a Non-Disclosure Agreement (the "NDA"). In the NDA, he acknowledged and agreed that he would hold the Company's "Confidential Information [as defined in the NDA] in strictest confidence and shall not disclose any Confidential Information to any third party or exploit it other than to fulfill [his] obligations to Sterling with respect o the Services [as defined in the NDA]."

31. When Mr. Myers' compensation arrangement was updated in February 2009, he was informed that his obligations under the Agreement would continue to remain effective. This understanding was set forth in a February 20, 2009 letter.

32. In recognition of Mr. Myers' contributions to the Company, Mr. Myers was highly compensated by Sterling. In 2011, Mr. Myers' received close to $200,000 in salary and other compensation.

33. On January 3, 2012, Mr. Myers unexpectedly submitted his resignation and advised the Company's Chief Executive Officer, William Greenblatt, that he would be going to work for one of Sterling's competitors, TalentWise.

34. In response to this announcement, Mr. Greenblatt advised Mr. Myers that such employment would be in direct violation of the restrictive covenants set forth in the Agreement. Mr. Myers did not provide any response to Mr. Greenblatt.

35. TalentWise is a direct competitor of Sterling and is similarly engaged in the highly competitive business of conducting employment screening, including criminal background checks, previous employment verification, educational credential verification, and drug testing.

36. Mr. Myers' last day of employment with Sterling was Friday, January 6, 2012.

37. Given Sterling's concerns about Mr. Myers' job plans, the Company sent Mr. Myers a January 6, 2012 letter reminding him of his obligations to Sterling and instructing him to cease and desist from breaching his obligations to the Company. Mr. Myers did not purport to correct or otherwise respond to such cease-and-desist letter.

38. Sterling also sent a January 6, 2012 letter to the Chief Executive Officer of TalentWise, informing him of Mr. Myers' obligations to Sterling and advising that if TalentWise ignored those obligations and hired Mr. Myers anyway, Sterling would deem TalentWise to have tortiously interfered with the contract between Sterling and Mr. Myers. TalentWise did not purport to correct or otherwise respond to such letter.

39. To date, both Mr. Myers and TalentWise have ignored this correspondence and have ignored Mr. Myers' contractual obligations to Sterling. Upon information and belief, Mr. Myers is now working for TalentWise.

40. If allowed to continue, Mr. Myers's actions will cause irreparable harm to Sterling and will have a devastating effect on its business.

41. Sterling has spent many years, substantial dollars, and vast resources to develop its confidential information. If Myers is not restrained from working for TalentWise or any other direct competitor and soliciting Sterling's customers and employees, Sterling will be irreparably harmed. With his access to Sterling's confidential information and business relationships, Myers will be able to misappropriate all of the time, effort and capital that was required for Sterling to develop its business.

42. To date, Mr. Myers and TalentWise have ignored Sterling's admonition to uphold Mr. Myers' obligations under his agreements with Sterling. If permitted to continue, Mr. Myers' misconduct will result in irreparable damage to Sterling because Sterling will lose the competitive edge it has paid for in years of building and developing relationships with Sterling's customers and employees. The damages will be vast and cannot yet be quantified at this point.

43. If Myers does not cease and desist his inappropriate activities, further damage to Sterling's goodwill and business will be certain and incalculable.

44. In addition to Mr. Myers, two other Sterling employees, Mr. Joseph Doyle and Mr. Michael Minnix, recently resigned from employment with the Company to join TalentWise, despite having non-compete obligations that specifically prevented them from working for direct competitors such as TalentWise.

45. Once Sterling became aware that these employees had commenced employment with TalentWise, it sent cease and desist letters to the employees, as well as TalentWise, dated December 12, 2012. No responses were made to those letters.

46. To date, those employees, Mr. Myers, and TalentWise have ignored Sterling's attempts to resolve this matter short of litigation.

**COUNT I**

**(Breach of Contract against Defendant Bruce Myers)**

47. Sterling repeats and realleges the allegations contained in paragraphs 1 through 46 above as if set forth more fully herein.

48. On November 8, 2007, Mr. Myers entered into an agreement with Sterling in which he agreed that for a one (1) year period following the termination of his employment, he would not compete with Sterling, solicit Sterling's employees or customers or use Sterling's confidential information.

49. Mr. Myers also acknowledged and agreed that a breach of the restriction covenants set forth in the Agreement would cause "irreparable damage to [Sterling] with respect to which [Sterling's] remedy at law for damages will be inadequate." Agreement, § 6(b).

50. Mr. Myers breached the non-compete provision of the Agreement by commencing employment with TalentWise, a direct competitor of Sterling, within one (1) year of his termination of employment with Sterling.

51. Sterling duly performed its obligations under the agreements.

52. Despite Sterling's demands that Mr. Myers comply with his obligations under the Agreement, Mr. Myers has refused to do so and continues to refuse to do so in breach of the Agreement.

53. As a result of Mr. Meyers' wrongful breach of the restrictive covenants set forth in the Agreement, Sterling has suffered and will continue to suffer monetary damages in an as yet unknown amount.

**COUNT II**

**(Tortious Interference with Contract Against Defendant TalentWise)**

54. Sterling repeats and realleges the allegations contained in paragraphs 1 through 53 above as if set forth more fully herein.

55. As previously described herein, Mr. Myers entered into a valid contract with Sterling in November 2007.

56. On January 3, 2012, Mr. Myers submitted his notice of resignation to Sterling and advised that he would be commencing employment with TalentWise.

57. In response to this announcement, Sterling's Chief Executive Officer, William Greenblatt, advised Mr. Myers that such employment would be in direct violation of the restrictive covenants set forth in the Agreement. Mr. Myers did not provide any response to Mr. Greenblatt.

58. On January 6, 2012, Sterling provided both Mr. Myers and TalentWise with notices of the restrictions set forth in the Agreement Mr. Myers executed with Sterling and instructed them to cease and desist violating Mr. Myers' obligations to Sterling.

59. TalentWise nonetheless intentionally interfered with and caused the breach of the contract by hiring Mr. Myers and continuing to employ him in violation of Mr. Myers' Agreement with Sterling.

60. As a result of the TalentWise's tortious interference of Mr. Myers' Agreement with Sterling, Sterling has suffered and will continue to suffer monetary damages in an as yet unknown amount.

**COUNT III**

**(Temporary Restraints, Injunctive and Declaratory Relief Against all Defendants)**

61. Sterling repeats and realleges the allegations contained in paragraphs 1 through 60 above as if set forth more fully herein.

62. Sterling seeks a temporary restraining order, injunctive and declaratory relief to prevent the continuing harm stemming from Defendants' continued breach of the restrictive covenants set forth in the Agreement.

63. In the Agreement, Mr. Meyers acknowledged and agreed any breach of the restrictive covenants set forth in the Agreement would cause irreparable harm to Sterling that could not be fully compensated by the payment of monetary damages to Sterling. Agreement, § 6(b).

64. Mr. Meyers further agreed that in the event he violated, or threatened to violate, the provisions of the Agreement, Sterling would be entitled, in addition to any other right or remedy it may have, "injunctions, both preliminary and permanent, enjoining or restraining such breach or anticipatory breach." Agreement, § 6(b).

65. Mr. Meyers' and TalentWise's actions, and anticipated actions, will cause Sterling severe, immediate and irreparable injury for which Sterling has no adequate remedy at law.

66. As a result of Mr. Meyers' breach or anticipated breach of the restrictive covenants set forth in the Agreement, together with the participation and acceptance of TalentWise, Sterling is entitled to injunctive relief restraining Mr. Meyers and TalentWise from further violations of the restrictive covenants set forth in the Agreement, as well as money damages as a result of such breach and other equitable and legal relief.

**WHEREFORE**, STERLING prays that the following relief be entered in favor of Plaintiff and against the Defendants:

(a) an order providing preliminary and permanent injunctive relief against Defendants requiring Mr. Meyers and TalentWise to comply with and honor the confidentiality, non-solicitation and the non-compete provisions of the Agreement, and Mr. Meyers cease and desist from working for TravelWise, in any capacity, until January 7, 2013;

Steven M. Hecht, Esq.
**LOWENSTEIN SANDLER PC**
1251 Avenue of the Americas
New York, New York 10020
Tel. (973) 597-2380
Fax (973) 597-2381
shecht@lowenstein.com
*Attorneys for Plaintiff*

12 CIV 0492

DOC # 1

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

U.S. DISTRICT COURT FILED JAN 2 2012 S.D. OF N.Y.

| | | |
|---|---|---|
| **STERLING INFOSYSTEMS, INC.,**<br><br>Plaintiff,<br><br>v.<br><br>**BRUCE MYERS, TALENTWISE, INC., JOHN AND JANE DOES 1-10, ABC CORP. 1-10,**<br><br>Defendants. | ) | Civil Action No.<br><br>**VERIFIED COMPLAINT** |

Plaintiff Sterling InfoSystems, Inc. ("Sterling" or the "Company"), by way of its Complaint against Defendants Bruce Myers, TalentWise, Inc., John and Jane Does 1-10, and ABC Corps. 1-10 (collectively, "Defendants"), hereby alleges and says as follows:

## NATURE OF THE ACTION

1. This is an action by Sterling to enforce the restrictive covenants that Defendant Bruce Myers, its former regional vice president of sales, agreed to when he commenced employment with Sterling in or about November 2007.

## PARTIES, JURISDICTION AND VENUE

2. Sterling is a Delaware corporation with its headquarters located at 249 West 17th Street, 6th floor, New York, New York 10011.

3. Bruce Myers is an individual residing at 3703 Sterling Avenue, Bloomington, Indiana 47401. Mr. Myers was employed as a regional vice president of sales for Sterling from

November 2007 until he resigned from his employment effective January 6, 2012. Upon information and belief, Mr. Myers either has commenced or is about to commence employment with TalentWise, Inc., a competitor of Sterling.

4. Upon information and belief, TalentWise, Inc. is a Nevada corporation with its headquarters located at 500 108 Avenue, 25th Floor, Bellevue, Washington 98007.

5. John and Jane Does 1-10 and ABC Corps. 1-10 are unknown individuals and/or corporate entities that may have engaged in wrongdoing as against Sterling with respect to this matter whose identities are yet to be determined.

6. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds $125,000, exclusive of costs and interest, and because there exists complete diversity between the parties.

7. Venue is proper in this judicial district pursuant to 28 U.S.C. 1391(a) because (a) the contract at issue provides it is subject to the courts and law of this district; (b) Defendants have taken actions purposefully directed towards New York and have purposefully availed themselves of the privilege of conducting activities in New York such that they have minimum contacts to support venue in this judicial district.

## GENERAL ALLEGATIONS

8. Sterling is in the business of conducting employment screening, including criminal background checks, previous employment verification, educational credential verification, and drug testing. Sterling's headquarters are in New York and has satellite offices around the country.

9. The Company has approximately 1,700 employees worldwide, several hundred of whom are located in the United States. Of those employees, approximately 65 are in sales.

10. Sterling's industry is highly competitive. In particular, while the products and services delivered by other companies in this space bear similarities to Sterling's, the distinctive elements that set its business apart from the others consist of the identity of Sterling's customers

-- including the manner in which Sterling establishes and deepens its customer relationships – as well as its prices and its profit margins.

11. Given the nature of Sterling's business, the Company prizes above all the development and protection of its customer relationships, which it views as its most valuable asset. Any development that would taint or jeopardize the Sterling brand and how Sterling is perceived or valued by its customers is the single greatest risk to Sterling's business. Accordingly, the very legitimacy of Sterling's business relies primarily on the reputation of the Sterling brand and the employees and officers that represent it.

12. The Company does not advertise the identity of its customers and chooses to remain discreet about pricing instead of advertising such items on its website or elsewhere.

13. Defendant Bruce Myers, who worked as a Regional Vice President from November 2007 until his recent resignation and separation from employment on January 6, 2012, was privy to all of the Company's highly sensitive and confidential information about its customers, including their identities, product selection and account management.

14. In this position, Mr. Myers had access to the Company's customer lists, prospect lists and pipelines, sales strategy, pricing and margin information, and other financial data.

15. Mr. Myers also had access to daily revenue reports identifying which customers were buying which products, information which was closely guarded and for which access was severely limited.

16. In addition, the Company continues to modify its business plans and strategies, and Mr. Myers was entrusted with this information, including strategies regarding possible mergers and acquisitions.

17. As Regional Vice President, Mr. Myers was responsible for, among other things: overseeing sales management and sales operations to ensure the highest levels of customer service and satisfaction; developing sales strategies and driving revenue growth for the Company; negotiating and assisting with sales efforts with large prospects and customers; contributing strategically to the growth and direction of Sterling's products and services; and

establishing and maintain significant relationships with Sterling's clients' senior-level decision-makers.

18. Mr. Meyers supervised approximately 8-10 employees and was responsible for hiring, training and mentoring both sales management and sales representatives.

19. Given his close relationships with both Sterling's employees (including upper-level management) and customers, as well as the key role he played in helping develop the Company's strategic vision, Mr. Myers had virtually unlimited access to the Company's confidential information.

20. Because of the sensitivity of the confidential and proprietary information to which Mr. Myers had access, he was required to sign certain agreements with Sterling from the outset of his employment in November 2007.

21. Mr. Myers signed a Sales Commission Agreement (the "Agreement"), which contains explicit terms regarding the confidentiality of Sterling's business information and trade secrets, as well as noncompetition and non-solicitation clauses.

22. The confidentiality, noncompetition and non-solicitation provisions contained in the Agreement were critical to Sterling's employment of Mr. Myers, and Sterling would not have employed Mr. Myers if he had not agreed to the covenants in the Agreement.

23. In the Agreement, Mr. Myers voluntarily and expressly agreed in Section 5(d), among other things, that during his employment and for one year thereafter that he would not "directly or indirectly engage in, assist, or have any active interest or involvement whether as an employee, agent, consultant, creditor, advisor, officer, director, stockholder… in any person, firm, or business entity which, directly or indirectly, is engaged in the same information services business as that conducted and carried on by the Company during [his] employment with the Company." Agreement, § 5(d).

24. With respect to the solicitation of customers, Mr. Myers agreed that during his employment and for one year thereafter that he would not, "directly or indirectly, solicit, contact, do business with, call upon or communicate with any customer, former customer or prospective

customer of the Company for the purpose of providing or selling services or other business engaged in by the Company at the time of [his] separation from employment." Agreement, §5 (e).

25. Pursuant to the terms of Section 5(e) of the Agreement, this restriction applied to "any customer, former customer or prospective customer of the Company with whom [Mr. Myers] had contact or about whom [Mr. Myers] obtained Confidential Information or Trade Secrets [as defined in the Agreement] during the twenty-four (24) months preceding [Mr. Myers'] separation from employment with the Company." Agreement, § 5(e).

26. In Section 5(f) of the Agreement, Mr. Myers also agreed to a restriction on soliciting the Company's employees whereby he would not, both during his employment and for one year thereafter, "either on [his] own account or on behalf of any person, company, corporation, or other entity, recruit, solicit, interfere with, or endeavor to cause any employee of the Company with whom [Mr. Myers] came into contact or about whom [Mr. Myers] obtained confidential information, to leave employment with the Company." Agreement, § 5(f).

27. Mr. Myers also acknowledged when he signed the Agreement that during his employment he would be entrusted with access to "Confidential Information", as that term is defined in the Agreement, that he would protect the Confidential Information, would return all Confidential Information in his possession upon the separation of his employment, and would not disclose or use any of that information following his separation. Agreement, §§ 5(a)(i), (b), (c).

28. Mr. Myers also acknowledged in Section 5(a)(ii) of the Agreement that: "[A]ny disclosure, divulging, revelation or use of any Confidential Information and Trade Secrets, other than in connection with the Company's business or as specifically authorized by the Company, will be highly detrimental to the Company, and that serious loss of business and pecuniary damage may result therefrom." Agreement, § 5(a)(ii).

29. Mr. Myers further agreed in Section 5(b) of the Agreement that: "[E]xcept as specifically required in the performance of [his] duties on behalf of the Company, [he] will not,

while associated with the Company and for so long thereafter as the pertinent information or documentation remains confidential, directly or indirectly use, disclose or disseminate to any other person, organization or entity or otherwise use any of the Company's Confidential Information or Trade Secrets." Agreement, § 5(b).

30. Similarly, Mr. Myers agreed to the terms of a Non-Disclosure Agreement (the "NDA"). In the NDA, he acknowledged and agreed that he would hold the Company's "Confidential Information [as defined in the NDA] in strictest confidence and shall not disclose any Confidential Information to any third party or exploit it other than to fulfill [his] obligations to Sterling with respect o the Services [as defined in the NDA]."

31. When Mr. Myers' compensation arrangement was updated in February 2009, he was informed that his obligations under the Agreement would continue to remain effective. This understanding was set forth in a February 20, 2009 letter.

32. In recognition of Mr. Myers' contributions to the Company, Mr. Myers was highly compensated by Sterling. In 2011, Mr. Myers' received close to $200,000 in salary and other compensation.

33. On January 3, 2012, Mr. Myers unexpectedly submitted his resignation and advised the Company's Chief Executive Officer, William Greenblatt, that he would be going to work for one of Sterling's competitors, TalentWise.

34. In response to this announcement, Mr. Greenblatt advised Mr. Myers that such employment would be in direct violation of the restrictive covenants set forth in the Agreement. Mr. Myers did not provide any response to Mr. Greenblatt.

35. TalentWise is a direct competitor of Sterling and is similarly engaged in the highly competitive business of conducting employment screening, including criminal background checks, previous employment verification, educational credential verification, and drug testing.

36. Mr. Myers' last day of employment with Sterling was Friday, January 6, 2012.

37. Given Sterling's concerns about Mr. Myers' job plans, the Company sent Mr. Myers a January 6, 2012 letter reminding him of his obligations to Sterling and instructing him to cease and desist from breaching his obligations to the Company. Mr. Myers did not purport to correct or otherwise respond to such cease-and-desist letter.

38. Sterling also sent a January 6, 2012 letter to the Chief Executive Officer of TalentWise, informing him of Mr. Myers' obligations to Sterling and advising that if TalentWise ignored those obligations and hired Mr. Myers anyway, Sterling would deem TalentWise to have tortiously interfered with the contract between Sterling and Mr. Myers. TalentWise did not purport to correct or otherwise respond to such letter.

39. To date, both Mr. Myers and TalentWise have ignored this correspondence and have ignored Mr. Myers' contractual obligations to Sterling. Upon information and belief, Mr. Myers is now working for TalentWise.

40. If allowed to continue, Mr. Myers's actions will cause irreparable harm to Sterling and will have a devastating effect on its business.

41. Sterling has spent many years, substantial dollars, and vast resources to develop its confidential information. If Myers is not restrained from working for TalentWise or any other direct competitor and soliciting Sterling's customers and employees, Sterling will be irreparably harmed. With his access to Sterling's confidential information and business relationships, Myers will be able to misappropriate all of the time, effort and capital that was required for Sterling to develop its business.

42. To date, Mr. Myers and TalentWise have ignored Sterling's admonition to uphold Mr. Myers' obligations under his agreements with Sterling. If permitted to continue, Mr. Myers' misconduct will result in irreparable damage to Sterling because Sterling will lose the competitive edge it has paid for in years of building and developing relationships with Sterling's customers and employees. The damages will be vast and cannot yet be quantified at this point.

43. If Myers does not cease and desist his inappropriate activities, further damage to Sterling's goodwill and business will be certain and incalculable.

44. In addition to Mr. Myers, two other Sterling employees, Mr. Joseph Doyle and Mr. Michael Minnix, recently resigned from employment with the Company to join TalentWise, despite having non-compete obligations that specifically prevented them from working for direct competitors such as TalentWise.

45. Once Sterling became aware that these employees had commenced employment with TalentWise, it sent cease and desist letters to the employees, as well as TalentWise, dated December 12, 2012. No responses were made to those letters.

46. To date, those employees, Mr. Myers, and TalentWise have ignored Sterling's attempts to resolve this matter short of litigation.

**COUNT I**

**(Breach of Contract against Defendant Bruce Myers)**

47. Sterling repeats and realleges the allegations contained in paragraphs 1 through 46 above as if set forth more fully herein.

48. On November 8, 2007, Mr. Myers entered into an agreement with Sterling in which he agreed that for a one (1) year period following the termination of his employment, he would not compete with Sterling, solicit Sterling's employees or customers or use Sterling's confidential information.

49. Mr. Myers also acknowledged and agreed that a breach of the restriction covenants set forth in the Agreement would cause "irreparable damage to [Sterling] with respect to which [Sterling's] remedy at law for damages will be inadequate." Agreement, § 6(b).

50. Mr. Myers breached the non-compete provision of the Agreement by commencing employment with TalentWise, a direct competitor of Sterling, within one (1) year of his termination of employment with Sterling.

51. Sterling duly performed its obligations under the agreements.

52. Despite Sterling's demands that Mr. Myers comply with his obligations under the Agreement, Mr. Myers has refused to do so and continues to refuse to do so in breach of the Agreement.

53. As a result of Mr. Meyers' wrongful breach of the restrictive covenants set forth in the Agreement, Sterling has suffered and will continue to suffer monetary damages in an as yet unknown amount.

## COUNT II

### (Tortious Interference with Contract Against Defendant TalentWise)

54. Sterling repeats and realleges the allegations contained in paragraphs 1 through 53 above as if set forth more fully herein.

55. As previously described herein, Mr. Myers entered into a valid contract with Sterling in November 2007.

56. On January 3, 2012, Mr. Myers submitted his notice of resignation to Sterling and advised that he would be commencing employment with TalentWise.

57. In response to this announcement, Sterling's Chief Executive Officer, William Greenblatt, advised Mr. Myers that such employment would be in direct violation of the restrictive covenants set forth in the Agreement. Mr. Myers did not provide any response to Mr. Greenblatt.

58. On January 6, 2012, Sterling provided both Mr. Myers and TalentWise with notices of the restrictions set forth in the Agreement Mr. Myers executed with Sterling and instructed them to cease and desist violating Mr. Myers' obligations to Sterling.

59. TalentWise nonetheless intentionally interfered with and caused the breach of the contract by hiring Mr. Myers and continuing to employ him in violation of Mr. Myers' Agreement with Sterling.

60. As a result of the TalentWise's tortious interference of Mr. Myers' Agreement with Sterling, Sterling has suffered and will continue to suffer monetary damages in an as yet unknown amount.

## COUNT III

### (Temporary Restraints, Injunctive and Declaratory Relief Against all Defendants)

61. Sterling repeats and realleges the allegations contained in paragraphs 1 through 60 above as if set forth more fully herein.

62. Sterling seeks a temporary restraining order, injunctive and declaratory relief to prevent the continuing harm stemming from Defendants' continued breach of the restrictive covenants set forth in the Agreement.

63. In the Agreement, Mr. Meyers acknowledged and agreed any breach of the restrictive covenants set forth in the Agreement would cause irreparable harm to Sterling that could not be fully compensated by the payment of monetary damages to Sterling. Agreement, § 6(b).

64. Mr. Meyers further agreed that in the event he violated, or threatened to violate, the provisions of the Agreement, Sterling would be entitled, in addition to any other right or remedy it may have, "injunctions, both preliminary and permanent, enjoining or restraining such breach or anticipatory breach." Agreement, § 6(b).

65. Mr. Meyers' and TalentWise's actions, and anticipated actions, will cause Sterling severe, immediate and irreparable injury for which Sterling has no adequate remedy at law.

66. As a result of Mr. Meyers' breach or anticipated breach of the restrictive covenants set forth in the Agreement, together with the participation and acceptance of TalentWise, Sterling is entitled to injunctive relief restraining Mr. Meyers and TalentWise from further violations of the restrictive covenants set forth in the Agreement, as well as money damages as a result of such breach and other equitable and legal relief.

**WHEREFORE**, STERLING prays that the following relief be entered in favor of Plaintiff and against the Defendants:

(a) an order providing preliminary and permanent injunctive relief against Defendants requiring Mr. Meyers and TalentWise to comply with and honor the confidentiality, non-solicitation and the non-compete provisions of the Agreement, and Mr. Meyers cease and desist from working for TravelWise, in any capacity, until January 7, 2013;

(b) a judgment in favor of Sterling against Mr. Meyers for his breach of the restrictive covenants in the Agreement for compensatory damages caused to Sterling as a result of Mr. Meyers' illegal conduct;

(c) a judgment in favor of Sterling against TalentWise for its tortious interference with the Agreement between Mr. Meyers and Sterling for compensatory damages caused to Sterling as a result of TalentWise's illegal conduct;

(d) an award to Sterling of its costs and reasonable attorney's fees incurred in pursuing this action; and

(e) Such other relief as the Court deems just and proper.

**LOWENSTEIN SANDLER PC**
1251 Avenue of the Americas
New York, New York 10020
Tel. (973) 597-2380
Fax (973) 597-2381
shecht@lowenstein.com

Attorneys for Plaintiff

By: ______________________
Steven M. Hecht

**VERIFICATION**

Richard Seldon, of full age, hereby declares as follows:

1. I am the President of Sterling InfoSystems, Inc.

2. I hereby certify under penalty of perjury that the foregoing factual statements made in the Verified Complaint are true and correct to the best of my knowledge, information, and belief and that I have reviewed the Verified Complaint and concur with its filing.

Dated: January 19, 2012

Richard Seldon

STATE OF NEW YORK )
) SS.:
COUNTY OF NEW YORK

Subscribed and sworn to, before me, this 19th day of January, 2012, Richard Seldon, personally appeared or personally known to me (or proved to me on the basis of satisfactory evidence) to be, the individual whose name executed the instrument.

Notary Public

JOSEPH MIGNONE
Notary Public, State of New York
No. 01MI6099578
Qualified in Richmond County
Certificate Filed in New York County
Commission Expires Nov. 10, 2015